## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**PAMELA G. SMITH,**
        **Plaintiff,**

**v.**                                            **Case No. 5:11cv147/RS/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
        **Defendant.**

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's applications for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and for supplemental security income under Title XVI, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, should be affirmed.

PROCEDURAL HISTORY

On January 26, 2005, Pamela Grace Smith (who will be referred to by name, as plaintiff, or as claimant) filed an application for disability insurance benefits.  T. 28.[1]  Claimant also filed an application for supplemental security income on April 6, 2005.  T. 28.  In both applications claimant alleged disability beginning November 8, 2004.  T. 28.  The applications were denied initially and upon reconsideration.  T. 54-56, 60-63.  Claimant filed a written request for a hearing, which was held before an administrative law judge ("ALJ") on June 25, 2007.  T. 283-328.  In a decision dated September 25, 2007, the ALJ denied claimant's applications for disability insurance benefits and supplemental security income, finding that jobs exist in significant numbers in the national economy that claimant can perform, and thus that she had not been under a disability within the meaning of the Social Security Act at any time from the alleged onset date to the date of decision.  T. 28-36.  The Appeals Council of the Social Security Administration denied plaintiff's request for review on July 31, 2008,   rendering the ALJ's decision the final decision of the Commissioner.  T. 17-19.  In the present action for review of the Commissioner's decision, Ms. Smith raises four issues, asserting that the ALJ's decision is not supported by substantial evidence, and that the ALJ erred in (1) finding plaintiff's knee and mental impairments non-severe, (2) rejecting the treating and examining source opinions, (3) finding the plaintiff's allegations not credible, and (4) rendering a flawed step five finding.  (Doc. 18, p. 1).

---

[1] The administrative record, as filed by the Commissioner, consists of 2 volumes (docs. 12 through 12-1), and has 328 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

## FINDINGS OF THE ALJ

In his written decision the ALJ made a number of findings relative to the issues raised in this appeal:

1. Claimant met the insured status requirements of the Social Security Act through December 21, 2009.

2. Claimant has not engaged in substantial gainful activity since November 8, 2004, the alleged onset date.

3. Claimant has the following severe impairment:  back disorders (discogenic and degenerative).

4. Through the date last insured claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Claimant has the residual functional capacity to occasionally lift twenty pounds and frequently lift ten pounds; to stand and walk in combination for about six hours in an eight-hour workday; and to sit for at least six hours in an eight-hour workday. Claimant should never climb ramps, stoop, and crouch or be exposed to hazards such as unprotected heights and moving machinery.

6. Claimant is unable to perform any past relevant work.

7. Claimant was born on August 11, 1957, and was forty-nine years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.[2]

8. Claimant has a limited education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability

---

[2] Claimant was actually forty-seven on the alleged disability onset date, and forty-nine at the time of the administrative hearing.

because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform.

11. Claimant has not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of the decision.  T. 28-36.

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'"  *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439).  Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support."  *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial

evidence.  *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).  The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record."[3]  *See Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).  The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot,

---

[3] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512. The Eleventh Circuit has explained the operation of step five:

> In practice, the burden temporarily shifts at step five to the Commissioner. *See Jones*, 190 F.3d at 1228. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. *See id.* In order to be considered disabled, the claimant must

> then prove that [she] is unable to perform the jobs that the Commissioner lists. *See id.*  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ("The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act")).

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity.  The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required at step five.[4]  "[R]esidual functional capacity is the most [claimant] can still do despite [her] limitations."[5]  20 C.F.R. § 404.1545(1).

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get

Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

FACT BACKGROUND AND MEDICAL HISTORY[6]

Plaintiff was born on August 11, 1957, making her forty-nine years old on the date of the administrative hearing.  T. 34.  Ms. Smith has a limited education and is able to communicate in English.  T. 34.  Alleging disability beginning November 8, 2004, plaintiff cited "lumbar later[al] vertebral disc disease" on the Disability Report as the condition that limits her ability to work.  T.76.  She reported past work experience as a cook.  T.77.

Before the onset of back problems, claimant had experienced pain in her knees. Beginning on June 15, 1998, claimant presented to Dr. Roland McArthur complaining of general knee pain for the prior six months when squatting, climbing stairs, or getting out of a chair.  T. 186.  Though ligaments and patella were stable, claimant's knees "clicked" on flexion and extension.  T. 186.  Dr. McArthur diagnosed patellofemoral syndrome, bilateral.  T. 186.  At a follow-up on July 21, 1998, Dr. McArthur noted that claimant was getting some relief from Arthrotec, and

---

medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[6] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as needed in the Analysis.

recommended isometric exercises.  T. 186.  Ms. Smith missed an appointment with Dr. McArthur in 1998, and did not visit him again until December 7, 1999.  T. 186. Dr. McArthur recorded that claimant was suffering from crepitus and chondromalacia of the patella, and over the following eight months administered two knee injections. T. 119, 186.  After plaintiff cancelled a planned arthroscopic surgery (because her husband was having surgery the same week), Dr. McArthur adopted a "wait and watch" approach, reasoning that claimant's knees were "not too bad now . . . we can always inject it in the future."  T. 118.  In October 2000 Dr. McArthur prescribed Vioxx, which "work[ed] pretty well." T. 118.

Throughout much of the relevant time frame plaintiff continued to visit her general physician, Dr. James DeRuiter, and at a December 12, 2003, appointment Dr. DeRuiter noted that plaintiff felt "shaky, stressed, and depressed."[7]  T. 110-14, 149. Two years later, however, in response to a question by the Division of Disability Determinations, Dr. DeRuiter clarified that her condition had been "situational stress, transient only," and not a separate and identifiable impairment that would preclude her from working.  T. 149.

Plaintiff returned to Dr. McArthur on June 9, 2004.  T. 117.  Though he noted her knees had done "reasonably well" with Vioxx, he prescribed Bextra.  T. 117. Soon thereafter, claimant's back problems began.  After lifting a five gallon bucket of water and experiencing immediate low back pain, plaintiff presented to Gulf Coast Medical Center ("Gulf Coast") with a lumbar strain on November 6, 2004.  T. 129-31.

---

[7] Plaintiff notes that "Dr. DeRuiter appears to have been Plaintiff's primary care physician." (Doc. 18, p. 5 n.3).  While this may be so, Dr. DeRuiter actually specializes in gynecology.  T. 149-86.  Plaintiff also visited Dr. Roger Gamad for general health issues from August 24, 2004, until February 9, 2005.  T. 111-15.  It appears that Dr. Gamad prescribes plaintiff's Xanax.  T. 94.

Claimant later visited Gulf Coast for spinal physical therapy, but was discharged on April 26, 2005, after continued pain with no noticeable improvement.  T. 120-34.

Prior to discharge, plaintiff had many visits with different doctors concerning her physical problems.  She saw Dr. McArthur two days after the lumbar strain, and he planned an MRI to investigate her low back pain.  T. 117.  The MRI showed mild degenerative disc disease and a small central disc protrusion at L5-S1 with disc dehydration.  T. 252.  Dr. McArthur prescribed Darvocet, Flexeril, and Mobic, and recommended staying off duty until receiving steroid injections.  T. 117.

On referral from Dr. McArthur, plaintiff presented to Dr. Keith Zwingelberg on December 21, 2004.  T. 226.  Plaintiff complained of pain in her lower back, buttock, and leg, radiating down to the feet.  T. 226.  Plaintiff presented with no apparent emotional or psychological problems and exhibited 5+/5+ strength in the lower extremities. T. 227. Dr. Zwingelberg diagnosed a small central disc herniation at L5-1, a disc bulge at L4-5, and possible facet disease, recommending trial epidural steroid injections at L5-S1.  T. 227.  Claimant had the first injection on January 24, 2005, and after still feeling "miserable," received a second in February 2005, when Dr. Zwingelberg also diagnosed "arthropathy minimal."  T. 223-25.  She reported increased pain three weeks later, and Dr. Zwingelberg prescribed Neurontin and Lortab.  T. 221.  He instructed that plaintiff was still off work due to illness.  T. 221.

At the same time, plaintiff had returned to Dr. McArthur for her knee problem.  T. 116.  In February 2005, Dr. McArthur noted that claimant's knees exhibited a "loud clunk" when moving from flexion to extension.  T. 116.  Claimant explained that she could "live with this problem," however, because she "need[ed] to get her back problem taken care of."  T. 116.  Plaintiff also asserted that Dr. Zwingelberg's

back injections were too painful, and she wished to discontinue them.  T. 116.  Dr. McArthur then referred plaintiff to Dr. Michael Reed for her back pain. T. 116.

On March 14, 2005, plaintiff presented to Dr. Reed in a "deconditioned" state, but sat comfortably during the patient interview, with appropriate affect and responses.   T. 147.  Claimant stated that her prior treatments provided no response, and that the pain was present at all times, increasing when performing daily activities. T. 145.  Both extension and gait pattern were normal, with full right-left rotation, and limited right-side bending with pain.  T. 147.  Claimant could squat and stand on her toes and heels, but her left-leg straight leg raising test was restricted to ninety degrees.  T. 147.  Dr. Reed assessed lumbar disc disease with radiculitis, believing part of the problem to be discogenic, and recommended physical therapy.  T. 148.

Plaintiff returned to Dr. McArthur on March 23, 2005, for follow-up for her knees.  T. 116.  Dr. McArthur noted that Ms. Smith was "doing very well on her knees," and though they snapped when extending from flexion, she had no fluid, edema, or tenderness.  T. 116.  Dr. McArthur prescribed glucosamine.  T. 116.

In April 2005 Dr. Zwingelberg administered medial nerve blocks at L4-S1, and claimant reported good pain relief after twenty minutes of sitting and standing.  T. 215-17.  At appointments on April 25, and May 16, 2005, however, claimant alleged continuing pain, and a three-level lumbar discography was performed on May 23, 2005.  T. 207, 209, 213-14.  Claimant experienced non-concordant pain at L3-4 and L4-5, and concordant pain at L5-S1, though she "tended to exaggerate her pain responses."  T. 207, 214.  Her discograms were equivocal.  T. 207.  At a visit with Dr. Reed on June 8, 2005, the doctor recommended symptomatic treatment only.  T. 207.

On June 3, 2005, State agency physician Dr. Robert Steele completed a

Physical Residual Functional Capacity ("RFC") Assessment.  T. 135.  Dr. Steele determined that claimant could stand for six hours and sit for six hours in an eight-hour workday.  T. 136.  Dr. Steele gave a primary diagnosis of degenerative disc disease and a secondary diagnosis of degenerative joint disease ("DJD").  T. 135.  He supported his RFC determination by citing plaintiff's chronic knee and lower back pain, and noted no related surgeries, normal gait, a negative straight leg raising test, "strong" strength, and crepitus bilateral knees with no effusion, edema, or tenderness.  T. 136.  Dr. Steele believed claimant's symptoms were attributable to a medically determinable impairment, but characterized them as "not severe."  T. 137, 140.

On July 11, 2005, Dr. Zwingelberg completed a Supplemental Statement for plaintiff's insurance.  T. 143.  He characterized claimant as "totally disabled – no bending or lifting."  T. 143.  Plaintiff continued to report pain during an August 2005 appointment, and Dr. Zwingelberg referred claimant to a psychologist and an orthopedic surgeon at the University of Alabama at Birmingham.  T. 205-06.

Before presenting to the referred psychologist, claimant underwent a State agency Psychiatric Review Technique on July 21, 2005.  T. 187.  Dr. Conger found no medically determinable mental impairment, assessing that claimant may experience some mild depression and tension related to her physical problems, but her emotional reactions appeared to be within "normal limits."  T. 187-99.  Listing only a "transitional problem," Dr. Conger asserted that claimant "appears to be solely limited by her physical difficulties," pointing out that claimant acknowledged her own ability to perform a wide range of routine activities of daily living within physical limitations, and relate to others in a socially appropriate manner.  T. 199.

Claimant then met with the Birmingham psychologist, Dr. Brent Decker, on

August 29, 2005.  T. 200.  She reported getting little sleep, and admitted that her husband can be "physically aggressive" toward her.  T. 201.  Claimant cited a history of depression in her family, and stated that she never felt happy and "cries over every little thing."  T. 201.  On the Beck Depression Inventory, Two, Ms. Smith scored in the "severe range" of clinical depression, and Dr. Decker's diagnostic impression listed depressive disorder "Not Otherwise Specified" ("NOS"), and generalized anxiety disorder.  T. 201.  Dr. Decker recommended marital therapy, a psychiatric evaluation for medication intervention, and a psychological evaluation to clarify her diagnosis.  T. 201-02.

On October 24, 2005, Dr. Zwingelberg diagnosed degenerative disc facet disease of sacroiliac with possible arthropathy, due to claimant's report of increasing pain.  T. 204.  Following that, Michael Stevens, Ph.D., a State agency psychologist, completed a Psychiatric Review Technique (claimant's second) on December 14, 2005.  T. 236.  Though Dr. Stevens diagnosed claimant with depression and anxiety NOS, he found Ms. Smith's mental impairments to be "not severe," with her only limitation to be mild difficulty in maintaining concentration, persistence, or pace.  T. 236-49.  Dr. Stevens noted that claimant had no history of psychiatric dysfunction, and no formal mental health treatment except for the use of Xanax prescribed by her primary care physician.  T. 248.  Dr. Stevens characterized examining-psychologist Dr. Decker's diagnosis as "depression/anxiety with intact MSE."  T. 248.

The following day, a non-examining State agency physician assessed plaintiff's physical residual functional capacity.[8]  T. 228.  Claimant's RFC was limited to

---

[8] According to plaintiff's memorandum, the final page of the form is missing from the record (what would be T. 235); however, it appears the form was completed between December 7, and 15, 2005, by Brett Jeffrey, M.D. T. 37, 228. (Doc. 18, p. 6).

standing or walking for a total of six hours, sitting for a total of six hours, and unlimited pushing or pulling in an eight-hour workday.  T. 229.  Other limitations included frequently lifting ten pounds, never climbing ladders/rope/scaffolds, occasionally climbing a ramp/stairs, and occasionally stooping and crouching.  T. 229-30, 232.  The physician noted that plaintiff had a normal gait with 5/5 strength in the lower extremities on her last exam.  T. 229.  The physician concluded that claimant's symptoms were attributable to a medically determinable impairment, and their severity was consistent with the total medical and non-medical evidence.  T. 233.  Claimant's statements were described as "reasonable and attributable to [the] MDIs in file," and "credible," thus reducing the RFC accordingly.  T. 233.  Nevertheless, Dr. Zwingelberg's opinion from July 2005, defining plaintiff as "totally disabled – no bending or lifting," was not given determining weight because that issue (determining disability) "is reserved for the Commissioner."  T. 235.

On October 2, 2006, a lumbosacral spine MRI was performed, revealing multilevel degenerative changes, worse at the L4-5 level, making the findings of plaintiff's 2004 MRI generally unchanged.  T. 250-51.  Specifically, the MRI showed degenerative disc disease at L4-5 and L5-S1, a central disc protrusion at L5-S1, and an annular tear and a left lateral disc protrusion at L4-5.  T. 250, 260.  The imaging also revealed decreased signal within the L4-5 and L5-S1 discs consistent with dessication, and fluid within the facets bilaterally at various levels.  T. 250-51.  Some time later, Dr. Zwingelberg completed a second Supplemental Statement for plaintiff's insurance on March 6, 2007.  T. 263.  Dr. Zwingelberg indicated that plaintiff was capable of sitting for one hour, standing for four hours, and walking for one hour in an eight-hour workday, and listed that claimant suffered from anxiety and

depression.  T. 264.  He reiterated that Ms. Smith was "totally disabled."  T. 264.

On May 7, 2007, claimant again visited Dr. Reed for her back pain.  T. 257.  She presented as moderately obese, and her affect and responses were appropriate.  T. 259.  Claimant reported that sitting, bending, lifting, and driving, increased her pain, but the pain remained the same when walking, or standing for a prolonged period of time.  T. 257.  Plaintiff had normal fluid movement in flexion, limited back extension with complaints of pain, a normal gait pattern, and slightly reduced rotation and side-bending of back with no complaints of pain.  T. 259.  Again, plaintiff was able to squat and stand on her toes and heels, and straight leg raising tests were normal.  T. 259.  Dr. Reed's ultimate impression was lumbar disc disease with no evidence of radiculopathy, and he recommended physical therapy.  T. 260.

Dr. Kamel Elzawahry conducted a neurological evaluation of Ms. Smith on June 4, 2007.  T. 261.  Noting that Ms. Smith was "well known to him" from her time as a cook at Gulf Coast, he described claimant as a "hard worker."  T. 272.  Dr. Elzawahry found claimant to be "truly depressed and tearful," and concluded that she suffered from lumbar radiculopathy, severe depression, and severe osteoarthropathy of both knees (based on Dr. McArthur's evaluation).  T. 261, 272.  Dr. Elzawahry assessed that plaintiff was "limited in her ability to function and is not able to perform instrumental activities of daily living."  T. 261.  He cited her affect and mood as reflecting anxiety and depression, but also dictated that plaintiff was oriented, obeyed simple and complex commands, had normal memory, and her judgment, attention span, and ability to calculate and abstract, were all within normal limits.  T. 273.  Claimant's gait and coordination were normal.  T. 272.  Dr. Elzawahry performed a Nerve Conduction Velocity test ("NCV") and an Electromyography ("EMG") of the

lower extremities.  T. 275.  Dr. Elzawahry's NCV impression was "normal," but he found the EMG results consistent with radiculopathy, although "an exact level could not be identified since the peripheral muscle exam is unremarkable."  T. 275.  He recorded that plaintiff is being considered for knee replacement.  T. 273.

Dr. Elzawahry completed a Physical Capacities Evaluation form, restricting plaintiff to sitting, standing, and walking, for three hours total in an eight-hour workday.  T. 262.  He concluded plaintiff was "totally and permanently disabled" and referred her for charity psychiatric treatment, leaving open the possibility of giving back injections since "it was felt that she is not a surgical candidate."  T. 272, 274.

## HEARING BEFORE THE ALJ

The administrative hearing commenced on June 25, 2007, with the testimony of Ms. Smith, who explained that she has seen no improvement with her back problems since the alleged onset date, despite receiving injections and physical therapy.  T. 292-93, 317.  When asked about the possibility of surgery, claimant stated that Dr. Reed "just wouldn't do it."  T. 293.  Claimant also stated that she no longer sees Dr. Zwingelberg because "he said he couldn't do no more, so he released me," similarly alleging that Dr. Elzawahry "can't do anything." T. 293-94.  Claimant described the pain as getting worse, beginning in her lower back and radiating down her buttock and legs.  T. 294.  She asserted that she can "walk around" for two hours and then sit for a few minutes, noting, "I stand. That's about the only thing I can do." T. 296.  She then qualified this statement, testifying that she could not perform a job that involved standing for six or seven hours because she "can't just stand in one spot. [She has] to . . . walk around and sort of move it."  T. 296.  Claimant explained that standing may cause her feet to swell, and while laying down alleviates the swelling,

a reclining position "starts hurting [her] back," concluding that no position exists where she is pain free. T. 304-05. Plaintiff claimed the pain "will make you almost pass out." T. 305. She asserted that she can sit for ten minutes at a time, and lift five to ten pounds "max." T. 296-97. Claimant stated that her left side is worse because "it goes numb," but she has no problems with her hands or arms. T. 303.

Ms. Smith described her activities of daily living, stating that her daughter sweeps, mops, and does laundry, because those activities are too painful for her. T. 297-98. She testified that her paralyzed brother-in-law lived with her until his death on May 19, 2007, and the only care she could capably provide was to feed him. T. 298-300. His death was preceded by the suicide of claimant's husband, on February 19, 2007. T. 300. She stated that she "[hasn't] really" driven for a year-and-a-half, and normally has other people drive her. T. 308. She visits with her neighbor and cousin. T. 308. A family member usually does her grocery-shopping for her because pushing the buggy "just kills [her]," though she can accompany someone to the grocery store and walk for thirty to forty-five minutes while they push the cart and pick up items. T. 308, 313-14. Claimant does "a little bit" of cooking for herself, and cooked for her brother-in-law and husband before their deaths. T. 314-15. Regarding her chondromalacia, she stated that her knees are "wore out", and "need surgery, but I just haven't done it." T. 309. Claimant "liv[es] with" her knees. T. 309.

When asked about Dr. Decker's diagnosis of depression, plaintiff testified to crying "once a day, sometimes more," since the onset of her back injury. T. 311. She did not seek consistent psychiatric treatment because she felt she could not be helped since her alcoholic husband "did everything and . . . it wasn't going to change." T. 311-12. She admitted that some days she did not want to get out of bed, but she could

force herself to get up, in part because of the physical pain she experienced when lying down.  T. 313.  She also admitted to "emotionally recovering" from the recent deaths of her husband and brother-in-law, saying, "[I]t's rough," but has not sought grief counseling.  T. 301, 308.  She listed her current medications as Lortab 10 (taking up to four a day), and Xanax, which "calms [her] down."  T. 110, 305-06.

Upon the conclusion of counsel's questioning, the ALJ received testimony from Paul R. Dolan, a vocational expert.  The vocational expert described claimant's past work history, citing three different positions as a cook.  T. 319.  Mr. Dolan then testified briefly about the claimant's transferable skills, stating that at age fifty (claimant was six weeks shy of age fifty at the time of the hearing) Ms. Smith would not have acquired any transferable skills to sedentary work.  T. 320.

The ALJ posed some hypothetical questions, focusing on the availability of jobs for someone like Ms. Smith, accounting for her vocational and medical factors:

> [Assume] an individual who's 49, almost 50 years of age and has completed the . . . 11th grade . . . assume a fair ability to read, write, and use numbers.  [A]ssume the past work history you just described and as shown on exhibit number 6E.  [A]ssume the following restrictions [from Exhibits 10F and 11F].  [A]ssume the individual can occasionally lift 20 pounds, frequently lift 10 pounds; stand for six hours, walk for six hours and sit for si[x] hours in an eight-hour day with normal breaks; never climb ladders, ropes and scaffolds . . . occasionally climb ramps and stairs and stoop and crouch . . . avoid exposure to hazards, including machinery and heights . . . from the mental standpoint, non-severe, so no restrictions there.  [Are there] jobs in the regional or national economy that such a person could perform . . . considering . . . past relevant work?

T. 320-21.  The vocational expert responded that such an individual "would be able to go back to work as a cook, short order, as defined and as performed, and would not be able to go back to any of the other past relevant work."  T. 321.

In proposing a second hypothetical, the ALJ directed Mr. Dolan's attention to the Supplemental Statement signed by Dr. Zwingelberg, dated March 6, 2007:

> [Assume sitting for] one hour a day, standing for four hours a day and walking for one hour a day.  And . . . no climbing or twisting, bending or stooping . . . reaching above shoulder level is occasional . . . operating any heavy machinery is also never.  [L]ifting and carrying is 10 pounds occasionally . . . fine finger movements can be frequent and also hand/eye . . .  coordination is frequent, and never is pushing and pulling . . . [W]ith those restrictions, would there be any jobs in the regional or national economy such a person could perform?

T. 321-22.  Mr. Dolan testified that such an individual could not perform claimant's past work, nor any other competitive work, due to the six-hour work limit.  T. 322.

The ALJ built upon the second hypothetical in crafting a third:

> If I changed that hypothetical, and . . . added one hour additional sitting and one hour additional walking, would that change your answer, because . . . it would come up with eight hours then?  [I]t'd be . . . two hours of sitting, four hours of standing and two hours of walking.

T. 322-23.  The vocational expert stated that his answer would change, and cited available work as a gate or security guard, an information clerk, and a surveillance system monitor, which comprised an almost-complete list of options.  T. 323.

The ALJ did not ask a hypothetical involving Dr. Elzawahry's Physical Capacities Evaluation from June 4, 2007, because his restrictions outlined "less than even half of a day" of work.  T. 324-25.  The ALJ then posed a final hypothetical:

> [A]ssume the testimony of the Claimant is fully credible and 100 percent accurate.  Would there be any jobs [that] such a person could perform?

T. 325.  The vocational expert responded that such an individual could not return to claimant's past work, nor perform any other work at a competitive level.  T. 325.  Mr. Dolan asserted that, assuming claimant's testimony was 100% correct and credible,

claimant could only work two to three hours per day.  T. 325.  He explained:

> The postural issues, regarding ten pounds max, walking for a couple hours and then sitting for ten minutes and . . . feet that swell and extreme pain which . . . would affect the concentration, persistence and pace . . . she would [reach] points of . . . passing out.  [T]here are some underlying issues regarding depression and crying . . . you could call it decompensation, in terms of a work setting, if they're crying all day."

T. 325.

Counsel noted that Dr. Elzawahry had  performed nerve conduction testing on June 4, 2007, and the results had been dictated, but not typed, by the date of the hearing.  T. 288-89.  The ALJ left the record open for ten days to receive Dr. Elzawahry's additional report.  T. 326.  This report, shown in Exhibit 18F, includes Dr. Elzawahry's office notes from plaintiff's appointment, and the graphic results from the NCV test and EMG, as discussed in the Factual Background.  T. 272-78.

## ANALYSIS

Claimant raises four issues in this appeal, arguing first that the ALJ erred in finding plaintiff's knee and mental impairments non-severe. (Doc. 18, p. 1).  Plaintiff alleges that her knee and mental impairments exceed the *de minimis* threshold for severity, and they should have been appropriately considered in the ALJ's step two finding and RFC determination.  (Doc. 18, pp. 10-12).

 The defining issue at step two will be addressed separately from the RFC determination issue.  At step two the ALJ must determine whether the claimant has a severe impairment. 20 C.F.R. § 1520(c).  The Commissioner's regulations provide:

> What we mean by an impairment(s) that is not severe.
>
> (a) Non-severe impairment(s).   An impairment or combination of impairments is not severe if it does not significantly limit your physical

or mental ability to do basic work activities.

(b) Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include–

(1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations;  and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.

The Commissioner has adopted an interpretive ruling addressing how to determine whether medical impairments are severe.  The ruling provides in part:

As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's

impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856 (1985).

In *Brady v. Heckler*, 724 F.2d. 914 (11th Cir. 1984), the Eleventh Circuit used the test later adopted in SSR 85-28 to state that a claimant's abnormalities must be of such kind that they would not be expected to interfere with the individual's ability to work. The Eleventh Circuit has further explained that "[s]tep two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).

First focusing on plaintiff's mental problems, the ALJ cited a State psychologist's December 2005 report in concluding such impairments were not severe. T. 30. Plaintiff asserts it was harmful error for the ALJ to ignore evidence from examining sources, and to consider her failure to seek ongoing mental health treatment without also crediting her reasons for doing so.[9] (Doc. 18, pp. 11-12).

Plaintiff did not see a treating psychologist for her mental impairments, and thus received three one-time diagnoses, each from a different examining or non-

---

[9] Plaintiff cites a Ninth Circuit case, *Regenitter v. Comm SSA*, to criticize the rejection of mental impairments based on a lack of treatment. (Doc. 18, p. 12). That criticism, expressed in two circuits, has not been an actual holding in either circuit. Rather, it seems to be a logical understanding of the under-reported nature of mental illness. In the Eleventh Circuit, a claimant's failure to seek treatment is a legitimate factor that the ALJ may consider in determining whether an impairment is severe. *See Carnley v. Astrue*, No. 5:07cv155/RS/EMT, 2008 WL 3896019, at *10 (N.D. Fla. Aug. 21, 2008) (*citing Watson v. Heckler*, 738 F.2d 1169, 1173 (11th Cir. 1984)).

examining psychologist.[10]  The first State agency psychologist found no medically determinable impairment, only mild depression related to plaintiff's physical problems.  T. 187-99. The second State agency psychologist—whose report is cited in the step two determination—diagnosed non-severe depression and anxiety "NOS," finding claimant's only functional limitation to be "mild" difficulty in maintaining concentration, persistence, or pace.  T. 30-31, 236-49.  The ALJ did not reject the third diagnosis, that of examining physician Dr. Decker, as plaintiff alleges.  (Doc. 18, p. 11).  Dr. Decker's report was accounted for in the second State agency review when the State psychologist characterized Dr. Decker's diagnosis as "depression/anxiety with intact mental health examination."  T. 248.  The ALJ specifically cited this in his step two determination.  T. 31.

Though Dr. Decker never explicitly used the phrase "intact mental health examination" in his report, the second State agency review (which characterized his report as such) is not necessarily inconsistent with Decker's diagnosis.  Dr. Decker noted that "[plaintiff] reports disruptions in . . . concentration levels," while the State psychologist reported a "mild" limitation in maintaining concentration.  T. 201, 246. Both also diagnosed depression and anxiety.  T. 201, 248.  Dr. Decker never noted any specific work-related restrictions, other than to record plaintiff's comments about the difficulty of performing housework because of her physical limitations.  T. 200-

---

[10] Dr. Elzawahry also diagnosed plaintiff with severe depression, and plaintiff points out that he is board certified in psychiatry.  (Doc. 18, p. 7 n.5).  It is unclear, however, whether that was an independent diagnosis, or a conclusion based on appearance or statements in plaintiff's medical record. Dr. Elzawahry noted that plaintiff was "prone to depression" because of her inability to work and the sudden death of her husband, and her "affect and mood reflected severe anxiety and depression."  T. 272-73.  He also recorded, however, that a "detailed evaluation of the mental functions was not performed on this occasion."  T. 272-75.

02.  During the evaluation Dr. Decker noted that plaintiff was a "pleasant lady" with normal memory recall and was "easy to engage," though she was critical of herself, and described feeling unhappy and guilty while facing a hopeless future.  T. 201.  Dr. Decker believed plaintiff would benefit from a psychiatric evaluation for medication intervention and a clarification of her diagnosis, with which plaintiff did not follow through.  T. 201.  Nothing in Dr. Decker's notes suggests that plaintiff's mental impairment was beyond the control of medication and/or therapy.  T. 200-02.

A diagnosis of depression in and of itself does not automatically equal a severe impairment at step two.  *See Carnley v. Astrue*, No. 5:07CV155/RS/EMT, 2008 WL 3896019, at *7 (N.D. Fla. Aug. 21, 2008) (*citing Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 (3d Cir. 2007)).  Plaintiff must also present evidence that shows the depression *significantly* limited her ability to perform basic work activities, or cope with the mental demands of working.  *Id.* (*citing* 20 C.F.R. §§ 404.1520(c), 404.1521(a)).  An impairment "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1988).

Neither of the two State agency reports found plaintiff's mental impairments severe.  Dr. Decker believed that plaintiff's illness should be clarified with another evaluation, but this clarification never took place.  Claimant conceded she is able to relate to others in a socially appropriate manner, and she continues to visit with her neighbors and relatives.  T. 199, 308.  She exhibited appropriate affect and responses on several visits with different doctors.  T. 147, 227, 259.  Dr. Elzawahry stated that plaintiff obeyed simple and complex commands, and her judgment, attention span, and ability to calculate and abstract, were within normal limits—all factors

considered under "basic work activities."   20 C.F.R. § 404.1521.   Though Dr. Zwingelberg assessed "depression" during one of plaintiff's visits, this conclusion appears to be based only on the fact that plaintiff was "tearful" during the exam, because no mental health evaluation was recorded.  T. 205.  These findings constitute substantial evidence to support the ALJ's determination that plaintiff's mental health problems are not severe.

Regarding plaintiff's knee problem, the ALJ did not mention this condition in his step two determination.  T. 33-34.  The failure to discuss an impairment at step two is not necessarily fatal.  *See East v. Barnhart*, 197 F. App'x 899 (11th Cir. 2006) (finding no reversible error in the ALJ's failure to discuss claimant's borderline personality disorder at step two where claimant did not list it on her application or any other personal paperwork, did not describe the disorder's effect on her ability to perform work activities, and most of the brief references to the diagnosis in the record occurred prior to the alleged onset date).  Here, plaintiff only received two injections for her knees in 2000, well before the alleged onset of disability date.  T. 119.  In 2004, after a four-year gap in treatment, Dr. McArthur noted that plaintiff was doing "reasonably well" on Vioxx, with only a "little bit of pain."  T. 117.  In Dr. McArthur's most recent visit with plaintiff in 2005, he described plaintiff as doing "very well on her knees."  T. 117.  Plaintiff considers her back to be her main problem, and at the hearing before the ALJ she testified briefly that her knees are "wore out," but she is "living with it."  T. 117, 309.  Plaintiff's disability report lists "lumbar later[al] vertebral disc disease" as her only impairment.  T. 76.  Given the lack of treatment sought in the years following the alleged onset date, substantial evidence supports a finding of non-severity for plaintiff's knee impairment.

Step two is a threshold inquiry, and simply allows the ALJ to proceed to the next step, which the ALJ did in this case. *See Delia v. Comm'r of Soc. Sec.*, No. 10-15092, 2011 WL 2748622, at *1 (11th Cir. July 14, 2011).  Assuming, *arguendo*, that the ALJ erred in his step two determination concerning plaintiff's knee and mental impairments, such error must be examined under a harmless error standard.  *See id.* Courts will disregard any errors or defects in a lower tribunal that "do not affect any party's substantial rights."  FED. R. CIV. P. 61 (harmless error); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983).  There is thus no reversible error if an impairment, found to be not severe at step two, is considered in succeeding steps of the disability determination.  *See Reed-Goss v. Astrue*, 291 F. App'x 100, 101 (9th Cir. 2008). Reversal is appropriate, however, if the ALJ fails to provide the court with a "sufficient basis for a determination that proper legal principles have been followed." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

Plaintiff asserts that the ALJ's failure to find plaintiff's knee and mental impairments severe led to harmful error because they were not properly considered in the RFC determination.  (Doc. 18, pp. 10-11).  The ALJ must consider both severe and non-severe impairments when determining a claimant's RFC, based on the relevant medical evidence as a whole.  *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).  In determining plaintiff's RFC, the ALJ apparently relied heavily on the Physical RFC Assessment completed by a State agency physician in December 2005, as the limitations described in both are almost identical.[11]  T. 31, 228-35.  The ALJ used this assessment, and the December 2005 Psychiatric Review Technique, in

---

[11] The State agency physician determined that plaintiff could occasionally climb a ramp or stairs, stoop, and crouch, and should avoid concentrated exposure to hazards, while the ALJ categorically prohibited those activities.  T. 31, 230-32.

forming his first hypothetical for the vocational expert during the hearing.  T. 321.

In calculating plaintiff's RFC, the ALJ pointed out that Dr. Decker reported intact mental status during his examination.  T. 34.  The ALJ also noted that plaintiff has no history of psychiatric dysfunction, no formal treatment for depression or anxiety, and only recent treatment with Xanax, prescribed by her primary care physician.  T. 34.  Additionally, the State agency review on which the ALJ relied in step two reported no severe mental impairments, with only mild difficulty in maintaining concentration or pace.  T. 32.  Plaintiff's mental history was thus discussed in the ALJ's RFC determination, but no limitations were ultimately included, because only one minimal limitation was identified by the State psychologist. T. 34.  To the extent that plaintiff asserted any more serious limitations, they were discounted as part of the ALJ's credibility determination.  T. 34.

The ALJ also discussed plaintiff's knee problems on two occasions in the RFC determination.  T. 28-36.  Initially, the ALJ noted that Dr. McArthur had diagnosed bilateral patellofemoral syndrome and recommended knee exercises; the second notation mentions that Dr. Elzawahry believed plaintiff to be a knee-replacement candidate with severe osteoarthropathy, based on Dr. McArthur's evaluation.[12]  T. 32-

---

[12] The ALJ actually stated that "Dr. Dervier" diagnosed patellofemoral syndrome, though it appears the ALJ simply misread the name "Dr. DeRuiter."  It was Dr. McArthur, however,  who made that diagnosis, and treated claimant from 1998-2005. T. 32, 116-19.  The ALJ cited to Exhibit 6F for Dr. McArthur's records, which includes one page from Dr. McArthur, but otherwise contains Dr. DeRuiter's records.  T. 32, 149-86.  This probably stems from the fact that the ALJ confused the two doctors, but plaintiff asserts error if the ALJ assumed Exhibit 6F reflected the entirety of plaintiff's history with Dr. McArthur.  (Doc. 20, p. 2).  While the ALJ did not cite the remainder of Dr. McArthur's records in his RFC determination, he clearly referenced them in the hearing.  T. 309.  The ALJ asked, "Dr. McArthur . . . said you had chondromalacia, particularly in the left knee?"  T. 309.  He then stated, "[H]e said you're doing pretty well with it . . . it makes a noise."  T. 309.  This information is reflected in Exhibit 2F, which contains Dr. McArthur's records in full.  T. 116.

33.

Dr. Elzawahry's statement concerning plaintiff's knee-replacement candidacy lacks any substantial foundation in the record. The only possible supporting evidence is a statement recorded by Dr. DeRuiter in a visit with plaintiff on March 24, 2000: "[H]as knee pain, has been told by Dr. McArthur that she may need an artificial joint." T. 185. Nowhere in his own records, however, did Dr. McArthur indicate that plaintiff was being considered for total knee replacement. T. 116-119, 186. To the contrary, in Dr. McArthur's most recent visit with plaintiff—five years after Dr. DeRuiter made that notation—Dr. McArthur stated that plaintiff is "doing very well on her knees," and only prescribed glucosamine. T. 116. Additionally, Dr. McArthur never specifically diagnosed plaintiff with "severe osteoarthropathy." T. 116-19, 186. It appears that Dr. Elzawahry drew an inference (perhaps incorrectly) concerning the knee condition from Dr. McArthur's records.[13]

In adopting the RFC calculated by the second State agency physician, the ALJ implicitly included limitations for plaintiff's knee impairment. In that report the physician listed a primary diagnosis of degenerative disc disease, and a secondary diagnosis of "DJD" for plaintiff's knee problem. T. 228. The first State agency physician also gave a secondary diagnosis of DJD, and cited chronic knee pain in crafting an RFC almost identical to the one adopted by the ALJ. T. 135-36. The ALJ assigned significant weight to the State agency reports. T. 33. Any error at step two (and I could find none), therefore, would not mandate a reversal.

Plaintiff next argues that the ALJ erroneously rejected the opinions of treating

---

[13] As stated in Dr. Elzawahry's notes, "[Claimant] was seen by Dr. McArthur . . . and was found to have severe osteoarthropathy of both knees and she is being considered for total knee replacement." T. 272.

and examining physicians Dr. Zwingelberg and Dr. Elzawahry, respectively.  (Doc. 18, p. 13).  The ALJ did not give these opinions controlling weight because the declarations of disability were not supported by the objective medical evidence, and the responsibility of determining whether an applicant is disabled rests with the Social Security Administration.  T. 34.  The ALJ thus gave significant weight to the opinions of the State agency physicians and psychologists because they were consistent with the medical evidence.  T. 33.

"The opinion of a treating physician . . . 'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'"  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (*quoting Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997)).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1241.  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.

In July 2005, Dr. Zwingelberg stated that plaintiff was "totally disabled – no bending or lifting," on a supplemental insurance statement.  T. 143.  Dr. Zwingelberg also indicated that "returning to work" was a focus of the treatment plan.  T. 143.  On March 6, 2007, Dr. Zwingelberg filled out a second Supplemental Statement.  T. 263-64.  Though he wrote that plaintiff was still under his care, he noted that plaintiff last visited him on November 30, 2005, almost one year and four months before the completion of the 2007 statement.  T. 263-64.  When asked what restrictions prevented plaintiff from returning to work, he only listed "totally disabled."  T. 264.

Dr. Zwingelberg again answered "totally disabled" in response to an inquiry about her expected improvements.  T. 264.  The only specific physical restrictions were provided under the "Physical Capabilities" checklist.  T. 264.  Dr. Zwingelberg reflected that plaintiff could occasionally lift ten pounds, perhaps contrary to his categorical prohibition against bending or lifting in the 2005 statement.  T. 143, 264.

A medical conclusion that a claimant is disabled is not entitled to controlling weight because the issue of determining disability is reserved for the Commissioner.  SSR 96-5P, 1996 WL 374183 (July 2, 1996).  The conclusion may not, however, be ignored, and the ALJ should determine whether such a conclusion is supported by the record.  *Id.*  The ALJ thus gave Dr. Zwingelberg's conclusory responses of "totally disabled" non-controlling weight.  T. 34.  Substantial evidence supports the ALJ's conclusion that Dr. Zwingelberg's assumption of disability was not substantiated by the objective medical evidence.  This additionally provides a legitimate "good cause" factor for giving Dr. Zwingelberg's treating opinion diminished weight.  Though not explicitly stated in the ALJ's opinion, plaintiff visited Dr. Zwingelberg over a ten-month period.  T. 204-27.  He recorded that plaintiff's pain was "worse [when] sitting," and "walking helps."  T. 205, 213.  Plaintiff also stated as much at the hearing:  "I stand.  That's about the only thing I can do."  T. 296.  Curiously, however, in outlining plaintiff's physical limitations one year and four months after seeing her, Dr. Zwingelberg restricted plaintiff to one hour of standing and four hours of sitting.  T. 264.

Dr. Zwingelberg's report is also inconsistent with the medical evidence provided by Dr. Reed, whom plaintiff visited at least four times, as recently as May 2007.  T. 147, 207, 216, 260.  Dr. Reed found that plaintiff's pain increased while

sitting, but remained the same with walking or prolonged standing.  T. 257.  As noted, Dr. Zwingelberg prohibited plaintiff from bending, but Dr. Reed found that plaintiff had only a ten percent loss on her left and right-side bending, with both sides reported as non-painful.[14]  T. 259.  Two State agency physicians found that plaintiff had 5/5 strength in her lower extremities, and Dr. Elzawahry noted that claimant had normal power in her upper and lower extremities, with normal gait and station.  T. 273.

Further contesting the ALJ's decision, plaintiff disputes the weight given to the two State agency physicians' reports, asserting that an obstetrician issued the first with an incomplete record.  (Doc. 18, p. 13).  While this may be true, the second report was completed with the treating physicians' opinions on file, and the RFC was only slightly reduced, still allowing plaintiff six hours of sitting, and six hours of standing or walking.  T. 229.  Although plaintiff alleges that the second report provided no explanation for allowing light exertional activity, the physician in question did support his opinion by citing several facts, such as plaintiff's MRI, and her inability to sit or stand for long periods of time.  T. 229.  The physician's statements are consistent with the objective medical evidence, thus supporting the ALJ's decision to grant significant weight to the State agency opinions.

As the ALJ found, Dr. Elzawahry's assumption of disability is also not supported by the objective medical evidence.  The questionable nature of Dr. Elzawahry's  diagnoses regarding plaintiff's knee impairment and depression has already been noted.  Plaintiff points out that Dr. Elzawahry considered the knee osteoarthropathy significant, and thus factored this into his physical capacities

---

[14] Dr. Elzawahry also found that plaintiff could occasionally bend, squat, crawl, climb, and reach, though the ALJ did not give his opinion controlling weight.  T. 262.

evaluation.  (Doc. 18, p. 10).  To the extent that this reflected Dr. Elzawahry's mischaracterization of the knee impairment's severity, however, the restrictions listed are not supported by the objective medical evidence.  The ALJ's decision is also supported by the evidence already noted with regard to Dr. Zwingelberg, including plaintiff's preference for walking, and the normal strength and coordination in her extremities.  Additionally, though Dr. Elzawahry reported that plaintiff's EMG results were consistent with lumbar radiculopathy, one month before that statement Dr. Reed had concluded that plaintiff showed no signs of radiculopathy.   T. 260, 275.  Furthermore, Dr. Elzawahry could not identify a specific level of radiculopathy because the peripheral muscle exam produced "unremarkable" results.   T. 275.  Plaintiff asserts that the physicians should have been re-contacted if the ALJ felt there was a lack of explanation for their conclusions.  (Doc. 18, p. 14).  Although the ALJ has a duty to develop a full and fair record, the issue was not a lack of explanation for the disability assumptions, but rather that the explanations were not consistent with the objective medical evidence as a whole.  T. 34.

Plaintiff asserts that the opinions of Drs. Zwingelberg and Elzawahry are consistent with Dr. McArthur's 2004 opinion that plaintiff could not work until further treatment for her back problems.  (Doc. 18, p. 14).  What Dr. McArthur had noted, however, was that "[Plaintiff] is still off duty until she gets those injections." T. 117.  Dr. McArthur made that statement within three weeks of plaintiff's initial back injury, when the severity of the injury, as well as possible treatment options, was still being assessed.   T. 117.  Generally Dr. McArthur only treated plaintiff's knees—thus his proscription included a limiting time-frame until plaintiff could visit a physician specifically for her back.  Meanwhile, Dr. Reed treated plaintiff at least

four times over two years and only recommended conservative treatment (physical therapy).  T. 147, 207, 216, 260.

Plaintiff next argues that the ALJ's credibility determination is not supported by substantial evidence.  (Doc. 18, p. 14).  The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  T. 32.  The ALJ thus concluded that the objective findings were inconsistent with an individual experiencing totally debilitating symptomatology.  T. 34.

It is within the ALJ's discretion to determine that a plaintiff's claims of pain and other symptoms are not credible.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  "But the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony."  *Id*.  Plaintiff asserts that the ALJ erred in finding her allegations inconsistent with the objective medical evidence because objective testing, including a painful discogram, documented her impairments.  (Doc. 18, p. 15).  The ALJ did not discredit the objective documentation, however, and specifically made note of plaintiff's discography.  T. 33.  Instead, the ALJ found the evidence to be inconsistent with *totally debilitating symptomatology*.

Plaintiff argues that several physicians found her complaints to be reasonably related to her medical condition.  (Doc. 18, p. 15).  With the exception of the State agency physician, however, no doctor touched on the severity of her symptoms.  The most they may have indicated, taking Dr. Reed's statement as an example, was that claimant's "symptoms are consistent with lumbar degenerative disc disease." T. 260.

The ALJ did not dispute that claimant's impairments could reasonably be expected to produce the alleged symptoms, but rather that her statements concerning their intensity, persistence, and limiting effects, were not entirely credible.  T. 32.  The second State agency physician did indeed state that the severity of claimant's symptoms was consistent with the total medical and non-medical evidence.  T. 233.  He accordingly reduced the RFC.  T. 233.  Nevertheless, the one physician who explicitly noted that claimant's statements were fully credible, also calculated that plaintiff could sit for six hours, and stand or walk for six hours, in an eight-hour workday.  T. 233.

The ALJ also considered plaintiff's activities of daily living in his credibility determination.  Plaintiff asserts that evidence of performing minor personal activities, by itself, does not demonstrate an ability to engage in substantial gainful activity, nor does it discredit a plaintiff's pain testimony. (Doc. 18, p. 16).  The ALJ, however, did not consider such evidence in isolation.  The ALJ noted that plaintiff could care for her personal needs, drive a car, prepare meals, and perform some chores.  T. 34.  But the ALJ additionally stated that plaintiff had normal gait with 5/5 strength in lower extremities, an intact mental status exam with no history of formal treatment, and noted that claimant's medications adequately managed her impairments, with no adverse side effects.  T. 34.  The ALJ concluded that "claimant's ability to engage in such activities, along with the medical evidence of record, indicates that the claimant is able to function at a level inconsistent with a finding of total disability."  T. 34.

Plaintiff also argues that the ALJ omitted relevant information in characterizing her activities of daily living, pointing to her various descriptions of difficulty in completing housework and chores.  (Doc. 18, p. 16).  The ALJ's summary of

plaintiff's daily activities is admittedly not detailed, but it is not necessarily inconsistent with plaintiff's statements.  T. 34.  The ALJ cited to plaintiff's Adult Function Report, completed on October 28, 2005, in which plaintiff contended that she needed help putting on underclothes and pants, but admitted she had no problems bathing, caring for her hair, and using the toilet.  T. 97.  Plaintiff also admitted that she prepared herself three "easy" meals a day and could do some laundry, though she usually needed help because three loads could "take all day."  T. 98.  Plaintiff stated that she could drive, go out alone, and maybe shop once a week for thirty minutes. T. 99.  At the hearing before the ALJ, plaintiff's description of some of her daily activities was more limiting.  For example, she stated that she does not like to drive, and has not "really" done so in a year-and-a-half because of the pain.  T. 308.  It is true that the ALJ's description does not encompass plaintiff's aversion to driving.  T. 34.  Nevertheless, there is substantial evidence to support the ALJ's decision that plaintiff's most recent statements are not fully credible, particularly in light of her prior admissions, and are inconsistent with totally debilitating symptomatology.

Finally, plaintiff argues that the ALJ's step five finding is flawed because three of the jobs the ALJ listed are semi-skilled, which plaintiff cannot perform because she does not have transferable skills.  (Doc. 18, p. 17).  The ALJ found, however, that transferability of job skills is not material to the disability determination because, using the Medical-Vocational Rules as a *framework*, claimant is "not disabled" with or without them.  T. 35.  Plaintiff cites two Social Security Rulings (and no case law) in support of her argument, but as defendant points out, those rules apply to the use of the Grids, which the ALJ only used for guidance.  T. 35; (Doc. 19, p. 11).

Given the context of this case, the error advanced could not in any case be

dispositive of any issue before the court.  The ALJ listed one sedentary, unskilled job in his step five determination.  T. 36.  Plaintiff asserts that she was fifty years old by the date of the ALJ's decision, making her disabled under the Medical Vocational Guidelines even if she could perform sedentary work.  (Doc. 18, p. 19).  This argument is without merit.  *See Miller v. Comm'r of Soc. Sec.*, 241 F. App'x 631, 635 (11th Cir. 2007) ("[Treating] Miller as either a person of advanced age or closely approaching advanced age under the grids is essentially theoretical because the ALJ did not rely exclusively on the grids in making the disability determination."). Because claimant was unable to perform a full range of light work, the ALJ properly considered the testimony of a vocational expert to determine job availability.  *See id.* (*citing Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987)).  Given the vocational expert's testimony, substantial evidence supports the ALJ's conclusion that the Commissioner met his burden at step five.

Where, as here, the ALJ has conducted a thorough examination of the record and properly considered claimant's medical condition as a whole to reach a determination supported by substantial evidence, this court may not reverse the Commissioner's decision.  *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

It is therefore respectfully RECOMMENDED:

The applications for disability insurance benefits and supplemental security income be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 6th day of July, 2012.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>


Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).